**NATIONAL LABOR RELATIONS BOARD v. MAC SMITH GARMENT CO., Inc.**

No. 14267.

United States Court of Appeals Fifth Circuit.

April 17, 1953.

Andrew P. Carter, New Orleans, La., Attorney, David P. Findling, Assoc. Gen. Cnsl., NLRB, Washington, D. C., A. Norman Somers, Asst. Gen. Cnsl., Washington, D. C., George J. Bott, General Counsel, Frederick U. Reel, Washington, D. C., Julian S. Perlman, Attorneys, National Labor Relations Board, for petitioner.

David Cottrell, Jr., Gulfport, Miss., Daniel G. Ross, New York City, Eaton & Cottrell, Gulfport, Miss., Becker, Ross & Stone, New York City, Albert A. DeStefano, New York City, of counsel, for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

## HUTCHESON, Chief Judge.

This petition for enforcement of an order of the National Labor Relations Board does not present for our decision the ordinary situation of a controversy between a single nationally affiliated union and an employer in which it is claimed that the employer is hostile to unionization and has acted so as to prevent its plant from being organized.

It presents, on the contrary, a situation in which an employer who has no record of anti-union activities and whose employees have been organized for years, finds itself caught in the tangled web of a two union controversy between the United Garment Workers, affiliated with A. F. of L., and the C.I.O.'s Amalgamated Clothing Workers of America.

These are the facts of record which underlie and furnish the background for the correct determination of this controversy. For several years preceding June of 1949, and without, as far as this record shows, any serious labor controversies having arisen, the United Garment Workers represented respondent's employees for bargaining purposes. Beginning at about that time the respondent and its employees commenced to be harassed and ground between the upper and the nether mill stones of the two competing union drives, or, to change the figure, blown about by the contrary winds generated in the struggles of the two unions for the position of bargaining representative.

After a whirlwind drive and in a hotly contested election, the C.I.O. received 331 as against 210 votes for the A. F. of L. union and when, on July 26th, an election for authorization of a union shop was conducted, and 419 voted with the C.I.O. for, as against 123 against, a union shop, as might well have been expected under the circumstances, the officers of the A. F. of L. turned up as officers of the C.I.O., and still the vicars of Bray.

Bargaining was then commenced by the company on August 4th, and by October 16th, the parties were close to a contract, the union holding out principally for seniority to be controlling with reference to tenure and layoffs, for contributions to the C.I.O. welfare funds, and its own form of arbitration, the company, on its part, holding out for its position that efficiency, attendance, and versatility should be controlling factors and not mere seniority.

Thereafter, the bottom dropped out of the shirt market, the company found itself stuck with a large unsalable inventory of shirts, suffered the loss of its only large customer, the principal stockholder who had been in charge of the shirt operation for which the Gulfport factory furnished practically all of the products withdrew from the company, and, in the latter part of November, 1949, respondent was forced to close its plant.

In January of 1950, a former business agent of the A. F. of L. presented to the plant manager at Gulfport a petition containing the names of approximately 500 workers. This petition read:

"We, the undersigned petitioners do respectfully petition the management of Mac Smith Garment Company to begin operations as soon as possible. We, the undersigned, are willing to return to work with no union contract. We are also willing to return to work with a union open shop."

The petition could not be, it was not, anti-union. Neither, presented by an ex-union officer, was it fostered by the company.

The C.I.O. and the company representatives in New York continued to confer and the C.I.O. was advised that the plant would open on a limited basis the latter part of March, 1950.

On March 3, Smith called Dickason, a high official in the union, and Garner to tell them that the plant would be reopened and a further conference with Dickason was arranged for March 10th, in New York.

On that day Dickason, representing the C.I.O., met with Mr. Ross in the New York office. The economic situation at the plant and the trial basis of reopening were explained to Dickason. She asked how the employees would be recalled. Smith explained the recall plans to her, and Dickason, telling him that she was very pleased to hear that the plant was reopening, stated that she could not say just what her reaction was to his method of calling the workers back, that "We ought to have a meeting and discuss it". Seniority was not mentioned. The company decided to reopen the plant with a small organization instead of the large one to try to keep the business at least alive. This meant that it would hire only one unit of manufacturers instead of two, about 300 instead of 640 which it had formerly employed.

There was employment opportunity therefore for less than one-half of the force when the plant shut down. Hiring was then done without any consideration whatever being given to whether or not employees were A. F. of L. or C.I.O. members or were without any union affiliation.

On April 6, 1950, the C.I.O. began filing unfair labor charges. Among them were charges of refusal to bargain and that the company had refused to rehire some eleven persons because of their membership in and activities in behalf of the C.I.O. On May 31, 1950, it filed a first amended charge, substantially the same as the first charges but it included the names of eleven additional employees.

On June 12, it filed a second amended charge still including twenty-two employees.

On September 15, it filed a third amended charge, this time dropping several and add-ing several, leaving in the end twenty-one names.

On December 31, it filed a fourth amended charge reducing the list to thirteen. The Board then issued a complaint charging many unfair labor practices, including the refusal to employ the persons named and the case went to trial before a trial examiner who found sweepingly against the respondent.

At the time that the C.I.O. was certified as bargaining representative in June, 1949, it had not complied with Sections 9(f) (g) and (h) of the National Labor Relations Act, 29 U.S.C.A. § 159(f–h). Though, therefore the examiner had made sweeping findings in favor of the C.I.O. throughout, the board on review of them rejected all the findings and recommendations in favor of the C.I.O. the examiner had made. Instead, however, of letting the hair go with the hide and thus throwing out the whole of the complaint, the board had sponsored, it adopted the examiner's findings as to the discharge of eleven employees, and it is the order of the board requiring their reinstatement which is before us for decision.

As to its findings as to these eleven persons, the board thus explains the process by which it reached it. Stating, that by a preponderance of the evidence, "the general counsel established a strong *prima facie* case indicating that in rejecting the eleven individuals in question the respondent was motivated by anti-union consideration," the board went on to say:

"Significantly, the only known union adherents who were called back to work were those who had signed a back to work petition stating that the employees were willing to work without a union".

Not only is there no evidence in the record to support this statement but it is directly contrary to the uncontradicted, indeed the accepted, evidence of Mr. Garner, the company's manager, as it appears on page 987 of the original record.[1] In addition, the board entirely disregarded the fact that officers and persons active in both unions

1. "Q. (By Mr. Cottrell) Mr. Garner, what per cent of the employees not signing the petition were employed by the company and are now on the company's pay-

were called back and that though five hundred five persons signed the back to work request, only about three hundred five were taken back.

The board also has completely disregarded the uncontradicted evidence that the persons were called back with regard to their efficiency and ability to work in the smaller organization, and that by the uncontradicted evidence it was shown that they found there had been a reduction of 1.566 man hours required to produce one dozen shirts, or a reduction in the man hours required to produce a shirt of 28.1 percent.

It disregarded also the testimony, which was bound to be true under the circumstances, that the respondent had been accused by both the A. F. of L. and the C. I.O. of siding with the opposition union and that before the campaign was over practically everyone at the plant was wearing a C.I.O. button.

Having thus stated what it regarded as the general counsel's *prima facie* case, the board then went on:

"Against this prima facie case, the respondent sought to explain each individual refusal of employment on nondiscriminatory grounds. We have examined the evidence elicited by the respondent in support of *its defenses with great care and find, as did the trial examiner, that these defenses are obvious pretenses and afterthoughts, and not supported by substantial evidence. Typical of these is the respondent's defense, asserted as to several of the individuals involved, that the person was not rehired because of her inability to get along with her fellow employees."* (Emphasis supplied.)

Without undertaking to set out in detail the evidence as to each of the persons claimed to have been discriminated against or further discussing the evidence as a whole, it is sufficient to say that an examination of the record upon the correct principle that the burden was on the board to make out its case and not, as the board seems to think, upon the respondent to defend itself, shows that there is no basis in the record for the findings of the examiner and the order based upon them. Indeed, there is no basis at all for them except suspicion and conjecture and a kind of cloak and dagger process of reasoning that because the first charge filed by the C.I.O. contained eleven names and after various amended charges it wound up with thirteen, this supposed remarkable coincidence enables the charge to take the place of proof.

Typical of the advocative approach of the examiner which the board approved is the distortion of a statement attributed to one of the officers of the respondent, that the basis of the selection was the fitness, capacity and willingness of the employees to work with and fit into their smaller organization and not whether they were union or anti-union, into a sly declaration of hostility to both unions and the statement of a cunning plan to keep union members out.

That this is a distortion is established by the uncontradicted evidence, that the great, the overwhelming majority of their employees had been members of one union or another, and by the fact that there is no basis in the record for the finding that respondent was in any way fostering one union against the other.

roll? A. I have all of that information in the file, which I have just requested be brought to me. My recollection of it is that, and of course you can correct me when I receive my file, but my recollection is that there were about 125 or 126 employees on our payroll in Nov., 1949, who did not sign that petition."

"Q. Yes. A. And if my memory is correct, we found that about 75 per cent, I believe, of those people were included on our payroll.

"Q. Are now on your payroll at the Mac Smith Garment Company? A. That's correct.

"Q. (By Mr. Cottrell) What per cent of the employees who signed the petition were reemployed at the plant? A. When we made our check on Saturday, Dec. 2, 1950, we found I believe, approximately 45 per cent of the people who had signed the petition, that they were employed." (Respondent's brief, p. 52.)

872

Upon the principles settled by the cases,[2] the findings may not stand. The petition for the enforcement of the order based thereon is denied.

2. Rubin Bros. Footwear, Inc. **v.** N. L. R. B., 5 Cir., 203 F. 486, and cases cited in it at note 3.